UNITED STATES of America,
Plaintiff-Appellee,

v.

Mark Allen WELLER,
Defendant-Appellant.

No. 80–1469.

United States Court of Appeals,
Tenth Circuit.

March 6, 1981.

Rehearing Denied April 13, 1981.

Carole C. Dominguin, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., with her on the brief), for plaintiff-appellee.

Robert S. Berger, Denver, Colo., for defendant-appellant.

Before SETH, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

In a two-count indictment Mark Allen Weller was charged with aiding and abetting Jeffrey D. Stowe in the armed robbery of two federally insured banks. The first count related to the robbery of the Arapahoe Bank and Trust in Englewood, Colorado on January 22, 1980, and the second count related to the robbery of the Centennial Bank of Pueblo in Pueblo, Colorado on January 24, 1980. In each count Weller was charged with aiding and abetting Stowe by purchasing a used automobile which he then furnished Stowe knowing that Stowe intended to use the vehicle in carrying out the bank robbery. The jury acquitted Weller on the first count, but convicted him on the second count, which charged the Pueblo bank robbery. Weller appeals his conviction and the sentence imposed thereon. We affirm.

Prior to trial, Weller moved to suppress certain physical evidence, as well as certain statements which he had made to agents of the Colorado Bureau of Investigation (CBI) and to officers of the Pueblo Police Department. The trial court held an extended evidentiary hearing in connection with the motion to suppress, and granted the motion in part, but denied the motion as to other matters sought to be suppressed. The only ground urged on appeal for reversal is the failure to grant Weller's motion to suppress in its entirety. A summary of the evidence adduced at the hearing on the motion to suppress will place the matter in focus.

Jeffrey Stowe robbed both the Englewood bank and the Pueblo bank at gunpoint. On the day before the robbery of the Englewood bank Weller bought a 1970 Ford, which was found the next day near the scene of the robbery, having, under the Government's theory of the case, been abandoned there by Stowe immediately after the robbery. Stowe was given some $5,400 by the teller at the Englewood bank, which sum included bait money.

The day following the Englewood bank robbery, Weller bought a 1972 Oldsmobile in Colorado Springs, Colorado. This vehicle was used by Stowe in connection with his robbery of the Pueblo bank. A silent alarm was sounded during the course of the Pueblo bank robbery to the end that the local police arrived at the scene while the robbery was still in progress. Using a bank customer as a hostage, Stowe and the hostage fled the scene in the 1972 Oldsmobile. With the police in hot pursuit, Stowe tried to elude the police by first doubling back. Stowe then drove for the open country, where he released the hostage, with the police still following. Stowe momentarily escaped, on foot, into a farmhouse where he was shot and killed in a shoot-out with the police.

The Pueblo office of the CBI is located in close proximity to the bank which Stowe robbed. Three CBI officers on duty at CBI's local headquarters heard about the robbery, and actually saw the chase of the getaway car by the police. About this time the CBI agents saw a person walking through an adjacent parking lot. Thinking the person looked a bit "out of place," two of the CBI agents followed him across the street into a K-Mart store, where they engaged the party in conversation.

The CBI agents asked Weller for identification, which he readily gave them. Weller told the CBI agents that he was from the State of Oregon, and was hitchhiking across the country. The agents testified that Weller did not look like a hitchhiker and asked if he would object to talking with them at the CBI building. Once at the CBI office, one agent called the Pueblo Police Department. That agent then informed Weller that the robber of the Pueblo bank had been shot and asked Weller if he would mind going to the offices of the Pueblo Police Department, where the police wanted to talk with him. Weller asked if he was under arrest and, when advised that he was not, he consented to going with the CBI agents to police headquarters. The CBI agents transported Weller to the Police building where they turned Weller over to the police authorities.

■ The motion to suppress sought, in part, to suppress all statements made by Weller to the CBI agents. The trial court denied this particular request, and this ruling is now assigned as reversible error. We do not agree.

The evidence clearly indicates that Weller was not arrested by the CBI agents, nor was he really in their custody. The agents testified that if Weller had declined to go with them to the Pueblo police headquarters, they would not have taken him there. In other words, the CBI agents candidly conceded that they did *not*, at that point, have probable cause to arrest Weller, and that Weller was in fact "free to leave."

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires a full and effective warning to one in police custody of his constitutional rights at the onset of the interrogation process, but *Miranda* does not require such a warning to "[G]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process . . . ." 384 U.S. at 477, 86 S.Ct. at 1629.

The present situation did not, in our view, call for the CBI agents to give Weller a *Miranda* warning. Weller was not under arrest, or in custody, as such. See *United States v. Bridwell*, 583 F.2d 1135 (10th Cir. 1978). The questions put by the agents were general in nature, and in fact elicited no response from Weller that was of an incriminating nature. Weller did not "confess" to the CBI agents, nor did he make damaging admissions against his interest. Counsel concedes such, but argues that some responses by Weller could have been interpreted by the jury as being "evasive." For example, Weller told the agents that he was a hitchhiker, and counsel suggests that the jury could have thought such to be an evasive answer. Such reasoning is too tenuous. The trial court did not err in denying the motion to suppress the communications, such as they were, between Weller and the CBI agents. Such do not come within the *Miranda* rule, and the fact that Weller was loitering in the immediate area where a bank robbery had taken place moments before was relevant and material. In this general regard, see *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) where the Supreme Court observed that a brief stop of a suspicious individual in order to check his identity, or maintain the status quo while obtaining additional information "may be most reasonable in the light of the facts known to the officer at the time." See also *United States v. Quinones-Gonzalez*, 452 F.2d 964 (10th Cir. 1971), where we held that general "on-the-scene" questioning in the factfinding stage of an investigation is not condemned by the *Miranda* rule.

After Weller was brought to the Pueblo police headquarters by the CBI agents, he was placed by the police in a holding cell and strip searched. He was then questioned by the police and midway through this questioning the interrogating officer decided that perhaps Weller was himself involved in the Pueblo bank robbery. At that point the questioning stopped, and Weller was given a full *Miranda* warning. Weller indicated he desired to talk to a lawyer, and the police assisted Weller in calling in a public defender, who conferred with him almost immediately thereafter.

The trial court ruled that Weller was in custody and under arrest at the moment he was placed by the Pueblo police in a holding cell and strip searched. Accordingly, the trial court suppressed the use at trial of any statements made by Weller to the Pueblo police prior to the giving of the *Miranda* warning. However, according to defense counsel, statements made by Weller to the Pueblo police prior to the giving of the *Miranda* warning were used by the police in developing other evidence of a highly incriminating nature, and that such should have been suppressed on the basis of the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We disagree.

Both at the evidentiary hearing on the motion to suppress, and later at trial, the owners of the two vehicles, which the Government contended were used by Stowe in the robberies, testified. The owner of the 1970 Ford, a resident of Golden, Colorado, testified that he sold the vehicle to Weller on January 21, 1980, for $375 in cash. He stated that Weller answered an ad which he had placed in a local Denver paper, and that in purchasing the vehicle Weller used the name Rod Smith.

The owners of the 1972 Oldsmobile, residents of Colorado Springs, Colorado, testified that they sold their vehicle to Weller on January 23, 1980, for $450 in cash. They testified that Weller answered an ad in the local paper concerning the vehicle and that Weller used the name Tom Smith. It later developed that certain of the money given the owners of the Oldsmobile in payment for the car was bait money obtained in the robbery of the Englewood bank.

█ It is counsel's position that all of the testimony from the previous owners of the Ford and the Oldsmobile resulted from information acquired by the Pueblo police during their questioning of Weller *before* he was given the *Miranda* warning, and therefore should have been suppressed as a "fruit of the poisonous tree." We do not agree with counsel's analysis of the matter. Reference should now be made to the state-

ments made by Weller to the Pueblo police *before* the *Miranda* warning, which statements, as above mentioned, were themselves suppressed by the court's order.

About the time the Pueblo police started questioning Weller, they had just learned that the actual robber of the Pueblo bank had been shot and killed, and at that point the police were primarily concerned with learning the identity of the dead person. Weller then admitted that he was not a hitchhiker, and that he and Stowe had driven from Oregon to Pueblo, Colorado in a Chevrolet Monte Carlo which belonged to Stowe's mother. He stated that he and Stowe had stayed in a Pueblo motel on the night of January 23, 1980, and that Stowe had left the motel around 10:00 a. m. on January 24, 1980, saying he (Stowe) was going to get some money. During this questioning Weller did mention that he had purchased the 1972 Oldsmobile. Such was his only reference to the Oldsmobile. He made no mention of the 1970 Ford. Weller did *not* tell the officers where, when, how, or from whom he had purchased the Oldsmobile. There was just the passing reference, not made in response to any questioning on the matter, that prior to coming to Pueblo he had purchased an Oldsmobile vehicle.

It is obvious to us that the Pueblo police did *not* learn from Weller that he had purchased the Oldsmobile which was used by Stowe in the Pueblo robbery on the preceding day in Colorado Springs, Colorado. This information did not come from Weller, and quite obviously was obtained by the police through other means. Assuming the "fruits of the poisonous tree" doctrine is otherwise applicable to the present fact situation, to assert that the testimony of the previous owners of both the Ford and the Oldsmobile was fruit gained from questioning of Weller by the Pueblo police is stretching the "fruit of the poisonous tree" doctrine too far. In order for that doctrine to have application, there must be some rational connection between the "fruit" and "the poisonous tree." Such connection in the instant case is in our view totally lack-

ing. To the contrary, it is quite apparent that the facts and circumstances surrounding the sale of the Ford and the Oldsmobile to Weller did not come from Weller, but from independent sources. *United States v. Sor-Lokken,* 557 F.2d 755 (10th Cir. 1977).

As above indicated, during his questioning by the Pueblo police, Weller stated that he and Stowe had traveled from Oregon, where they both resided, in a Chevrolet Monte Carlo which belonged to Stowe's mother. He also stated that his personal effects were in that car, together with a sizable sum of money which he had brought from Oregon. These statements were made before the *Miranda* warning, and hence, under the court's suppression order, were not admitted at trial.

Backtracking a bit, shortly after Weller had been taken to the Pueblo police building by CBI agents, another CBI agent discovered a Chevrolet Monte Carlo with Oregon license plates parked next to the CBI building. In this regard, it was the Government's theory of the case that although Weller was not physically present at the bank robbery, he and Stowe had intended to rendevouz at the location of the Monte Carlo, and then continue on to the next town. In any event, the Monte Carlo was later towed to the basement of the Pueblo police building in which Weller, by that time, was being held. An incident then occurred which counsel says requires a reversal.

As above mentioned, Weller made the statement to the Pueblo police, which statement was suppressed, that he and Stowe had traveled from Oregon to Pueblo in a vehicle belonging to Stowe's mother and that he (Weller) had some personal belongings, including a sizable sum of money, in the vehicle. Some time after Weller had conferred with the public defender, the Chevrolet Monte Carlo was towed into the basement of the police building. Thereafter, the Pueblo police had some conversation with Weller concerning the Monte Carlo and the fact that Weller had earlier claimed some of his personal effects were in the vehicle. Specifically, the police advised Weller that the Monte Carlo would be kept in the basement until a search warrant could be obtained, and asked Weller if in the meantime he wanted his belongings from the vehicle. It was in this setting that Weller said he would like to get his suitcase with his clothing and his money from the vehicle. Weller's request was granted. Weller selected a key which had been taken from him when he was booked into the jail, and, accompanied by an officer, they proceeded to the basement. There Weller unlocked the trunk, opened it, and identified a suitcase and remarked that it was his, as well as some clothing therein. Weller then proceeded to the right rear area of the trunk and "came up with a small gray plastic box" containing $1,390 in cash. The money was inventoried and then placed in the jail vault for safekeeping. It later developed that certain of the bills, which Weller had claimed were his, were bait money obtained in the robbery of the Englewood bank.

It is counsel's position that the evidence derived from the "Monte Carlo search" should have been suppressed. The trial court did not suppress testimony relating to the Monte Carlo incident, and, under the unique circumstances above described, we find no error in this ruling.

█ Defense counsel concedes that Weller would have no standing to challenge a search of the Monte Carlo had one been made immediately upon its arrival at the police building. A search of the Monte Carlo was made several days later after the owner of the vehicle, Stowe's mother, consented thereto. Actually, we are not here concerned with any search of the vehicle, as it was Weller himself who opened the trunk door with a key which had come from his possession, and then identified a suitcase and a plastic box which Weller claimed were his. Such did not constitute a "search" of the Monte Carlo. In this regard, see *United States v. Quinones-Gonzalez,* 452 F.2d 964 (10th Cir. 1971). In that case the defendant requested that certain of his personal effects be removed from a motor vehicle and returned to him. The officers complied with such request, and the

defendant later claimed an illegal search and seizure of the vehicle. In such setting we held that the officers, in obtaining and delivering the belongings to the defendant, had not made a "search" of the vehicle.

 If we understand counsel's argument, he claims the Monte Carlo incident was "fruit" which resulted from statements made by Weller to the Pueblo police, which statements had themselves been suppressed. We are not in accord with this analysis of the matter. Weller himself requested that he be allowed to retrieve certain belongings from the trunk of the Monte Carlo. The police simply granted Weller's request. The "fruit of the poisonous tree" doctrine is simply inapplicable. This is not an instance where the police were directed to the vehicle because of what Weller had previously told them. Rather, this is an instance where, long after the *Miranda* warning was given, Weller simply sought to reclaim certain items from the trunk of the vehicle which he claimed were rightfully his. In short, the police didn't open the trunk door of the Monte Carlo, Weller did.

The suggestion is also made that the public defender should have been advised before Weller was allowed to reclaim his property from the Monte Carlo. This matter should be placed in perspective. When Weller was advised of his *Miranda* right, he requested to see a lawyer. The request was promptly granted. The public defender conferred with Weller almost immediately, and the questioning of Weller was not resumed. The Monte Carlo incident occurred an hour or so later, when Weller requested that he be allowed to retrieve his money from the car. The fact that bait money from the Englewood robbery was found in the currency which Weller claimed as his was no doubt damning evidence, even though he was later acquitted on the Englewood robbery charge. However, at the time of the Monte Carlo incident there is nothing to indicate that the Pueblo police even knew of the Englewood bank robbery. All things considered, it is quite clear to us that Weller's request to regain possession of his belongings from the trunk of the Monte Carlo was voluntary on his part.

Judgment affirmed.