UNITED STATES of America, Plaintiff,

v.

Randy Lee BECKWITH, Defendant.

No. 2:97 CR 176K.

United States District Court,
D. Utah,
Central Division.

Sept. 23, 1998.

Randy Lee Beckwith, Salt Lake City, UT, pro se.

Herschel P. Bullen, Salt Lake City, UT, for Randy Lee Beckwith.

Laurie J. Sartorio, U.S. Attorneys Office—Utah, for U.S.

## ORDER AFFIRMING REPORT & RECOMMENDATION

KIMBALL, District Judge.

This matter was referred to Magistrate Ronald N. Boyce pursuant to 28 U.S.C. § 636(b)(1)(B). Judge Boyce issued a Report and Recommendation, dated August 7, 1998. Defendant Beckwith filed objections to the Report and Recommendation on August 19, 1998. The United States similarly filed objections on August 20, 1998. Defendant then filed a response to the United States' objections on August 26, 1998.

Having reviewed and analyzed the Report and Recommendation and the objections and responses of the parties, this Court finds no merit to either parties' objections. Accordingly, this Court approves the Magistrate Judge's Report and Recommendation in all its particulars and adopts it as the Court's own Order.

## REPORT & RECOMMENDATION

BOYCE, United States Magistrate Judge.

The defendant, Randy Lee Beckwith, has been indicted and charged with one count of armed bank robbery (18 U.S.C. § 2113(a) & (d)) and one count of use of a firearm in relation to a crime of violence, the bank robbery (18 U.S.C. § 924(c)(1)). The offenses were allegedly committed in Salt Lake City, Utah on August 27, 1996 (File Entry # 1).

The defendant made a motion to suppress evidence, alleging his arrest in Denver, Colorado on or about August 30, 1996, was illegal and that evidence taken from him and statements obtained from him should be suppressed (File Entry # 28). Defendant filed a second similar motion to suppress (File Entry # 29).

The United States made a preliminary response to the defendant's motions (File Entry # 34). The defendant submitted a supplemental memorandum and another memorandum was submitted and filed seeking suppression of a statement defendant allegedly made to FBI Agent Castro in the Denver County Jail (File Entry # 58).

An initial hearing on the motions to suppress was held on January 14, 1998 (File Entry # 61). A second hearing was held on January 23, 1998. Post hearing briefs were requested. The defendant submitted a post hearing memorandum on March 19, 1998 (File Entries # 's 83 & 85). The United States submitted its post hearing memorandum received by the Magistrate Judge on May 5, 1998. The defendant submitted a reply memorandum on May 19, 1998 (File Entry # 96). The reply was received by the Magistrate Judge on May 26, 1998. A final argument was held on June 9, 1998. Additional memorandum were submitted. Defendant's last memorandum was submitted on July 13, 1998.

The case has been referred to the magistrate judge under 28 U.S.C. 636(b)(1)(B). This report and recommendation is submitted pursuant to the reference on the defendant's motion to suppress evidence on Fourth and Fifth Amendment grounds.

### *Evidence*

The initial hearing on this motion was held on January 14, 1998. At that time, Officer Wayne C. Depew, a police officer with the City and County of Denver, testified. He had been an officer for twenty seven (27) years (Tr. p. 6). On August 30, 1996 Officer Depew was working as a patrolman with the Denver Police Department (Tr. p. 7). He was assigned to District Six, the lower downtown area with lower income housing areas. It was considered a high crime area, with a large volume of narcotics activity. The officer was also engaged in narcotics efforts. As

a uniformed officer he would make arrests in "buy/bust operations" by narcotics detectives (Tr. p. 8).

On August 30, 1996 a vehicle stop was made of a driver named Dale Robbins. The vehicle was a four door silver Nissen. The vehicle was in bad shape. The back window was out, with a plastic cover, it had California plates. The vehicle was in a "signed left turn lane from Broadway Southbound." The vehicle had to make a left turn onto 21st Street. The vehicle came out of the lane and crossed back into the lane of traffic. The driving action violated the Denver City Code by violating a designated lane assignment. The vehicle failed to turn and returned to the traffic. There was another officer along with Depew who was driving the police vehicle and that officer, Bloodworth, mentioned the driving violation and the officers pulled in behind the vehicle to stop it. At that time they also noticed that the California license plate had expired (Tr. pp. 8–10). Officer Henry Bloodworth was the officer driving the vehicle and Depew informed Bloodworth of the driving violation.

The defendant's vehicle was pulled to the curb (Tr. pp. 10–11). Officer Bloodworth approached the driver, Depew went to the passenger side for safety reasons. Depew observed that the vehicle's back window was out. In the rear of the vehicle was numerous articles of clothing suggesting people were living in the vehicle (Tr. p. 12). He noticed a bottle of Chlorox bleach and discolored rags with a red substance. Depew could not hear the conversation between Officer Bloodworth and the driver. Depew initiated a conversation with the passenger (Tr. p. 12). The defendant Randy Lee Beckwith was the passenger. The officer asked Beckwith for his name. Beckwith stated he had no "I.D." on him. The officer then asked Beckwith to exit the vehicle, which he did. A pat down was conducted but nothing was found (Tr. p. 13). Defendant seemed nervous while talking to the officer. Defendant gave the officer the name of Christopher Ayer with a date of birth of September 8, 1956. Because of the out of state plates, the officer asked defendant where he was staying and he said a motel on South Broadway in Denver, but

could not give a name of the motel or its address. The officer wanted the information for a field card contact (Tr. pp. 14–15). Defendant said he just met the driver. The officer asked defendant to get back in the vehicle after the officer had obtained the information he had sought (Tr. p. 15).

Officer Depew than walked around to the driver's side of the vehicle where Officer Bloodworth was talking to the driver (Tr. pp. 15–16). Officer Depew asked the driver the name of the passenger and the driver said "Randy" and he said he didn't know his last name. The driver said he'd met the passenger a couple of days before. The driver did not know the name or address of the motel where the two were staying but said it was on South Broadway.

Because the passenger said his name was Christopher and the driver said it was Randy and based on the passenger's behavior Officer Depew believed the passenger had lied to the officer about the passenger's name and the officer had a right to make an arrest (Tr. pp. 16–17). The officer went around to the passenger and told him he was under arrest. The defendant asked what for and the officer told him that the driver said his name was Randy. Defendant finally gave the officer the name of Randy Beckwith (Tr. p. 17). Defendant was taken out of the vehicle, told he was under arrest and then defendant was told what the driver had said. The arrest was based on a Denver City ordinance, a misdemeanor (Tr. p. 17). Defendant was handcuffed, patted down and a large quantity of cash was found in defendant's front pant's pocket. Twenty dollar bills were found which appeared discolored with red dye on them. The officer put the money in defendant's shirt pocket (Tr. p. 18). In another pocket a small amount of what appeared to be black tar heroin was found (Tr. p. 19). This was a felony narcotics violation (Id.). When the officer was placing defendant in the car, he noticed defendant make a motion with his leg and the officer observed a brown wallet lying on the concrete in the gutter. The officer picked it up. It was bulging with twenty dollar bills. It contained a California driver's license and "ID" in the name of Randy Beckwith. It also contained a photo-

graph of defendant (Tr. pp. 19–20). The officer gave defendant his wallet but kept the "ID." The officer did not, at that time, suspect defendant as being involved in a bank robbery (Tr. p. 20).

In the police car, on the way to police headquarters, Officer Depew gave the defendant a Miranda[1] warning, which defendant said he understood (Tr. p. 21). During the ride to the police station, defendant was moving about quite a bit and this raised the officer's suspicion. The officer took defendant's wallet out of his pants from where defendant was attempting to remove it. The officer put the wallet in defendant's shirt pocket. During the ride to police headquarters, defendant said he would like to help the police and would make drug buys in the area (Tr. p. 21). On arrival at the police station, because of what defendant had said, he was taken to the vice bureau to meet with the narcotics detectives. Defendant was placed in a holding cell (Tr. pp. 21–22). The officer observed a large amount of cash on the floor of the cell. Apparently it was the money that had been put in defendant's shirt pocket, which now didn't have any cash in it. Defendant was trying to push the money under a bench (Tr. p. 23).

The traffic stop of the vehicle and defendant was routine (Tr. p. 28). The driver was cited for a no insurance, and expired plates. Officer Bloodworth gave the driver a break and did not charge the lane violation (Tr. p. 28). The driver's name was Robbins (Tr. p. 31). When defendant said his name was Christopher Ayer, the officer suspected that he was lying (Tr. pp. 31–32). No middle name was given by defendant when he first gave the name of Christopher Ayer to Officer Depew (Tr. p. 33). Prior to defendant's arrest he was free to leave, he could have gotten out of the vehicle and left (Tr. p. 35). The officer did not inform Beckwith of that fact (Tr. p. 35).

After defendant's arrest, a packet of heroin was found in his pocket (Tr. p. 36). After defendant was handcuffed, that was the time when the officer found defendant's wallet (Tr. p. 37). The stop of the vehicle by the officers was about 15:10 hours (3:10 pm).

The rags and "chlorine bleach" the officer observed was not confiscated (Tr. p. 41). The defendant was given a Miranda warning, orally, after his arrest while defendant was in the police vehicle as it was pulling away. The warning was deficient because defendant was not told he could have an attorney present before or during questioning, even if he could not afford an attorney (Tr. p. 53). Defendant was not questioned, but defendant volunteered a willingness to help the narcotics detectives (Tr. p. 54).

During the initial encounter, defendant was cooperative (Tr. p. 55).

Special Agent Michael Castro, Federal Bureau of Investigation (FBI), Denver field office, testified that in August, 1996 he was working bank robberies investigations (Tr. pp. 61–62). The agent became familiar with the defendant when the Denver Police robbery unit and another FBI agent gave Agent Castro some information that money with red dye stains was taken from defendant which was similar to the security dye used against bank robberies (Tr. p. 63). Agent Castro was working on an August bank robbery in Denver and the driver of the vehicle who was with defendant, Robbins, matched the description of the bank robber (Tr. pp. 63–64). Castro was advised that the defendant was cooperative and was willing to give information, however it was also said that the other officers felt defendant was not involved (Tr. p. 64). The agent was interested in talking to Beckwith about the dye stained money (Tr. p. 65).

The agent went to the Denver County Jail and indicated he would like to speak to Beckwith. He came from where he was being detained into one of the interview rooms. No threats were made, the agent introduced himself to Beckwith. The agent's intent was to have Beckwith be a witness for the agent about the Denver bank robbery (Tr. pp. 65–66). The agent had a conversation with Beckwith. The agent told Beckwith he'd like him to be a witness. Beckwith said he may know where the red dye came from but wanted his drug case fixed (Tr. p. 67). The agent said he couldn't promise him anything

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

like that and that condition would have to go through the prosecutor and defense counsel and the agent would have to know what Beckwith knew. The agent also said he would like Beckwith to take a polygraph exam (Tr. p. 67). The conversation lasted about 10 to 20 minutes. The interview was on September 5, 1996. The agent set a polygraph exam for September 11, 1996.

The polygraph exam on September 11, 1996 took place at the county jail. It was conducted by Bill Irvin, an FBI polygraph examiner. The exam was conducted in an office. Beckwith was brought to the office and given a *Miranda* warning (Tr. p. 68). This was done verbally and in writing (Tr. pp. 69–70). A written consent to a polygraph examination was obtained from Beckwith. Exhibit 1 is an advice of rights form which was executed by Beckwith at 10:05 am. The form was reviewed with the defendant, he waived his rights and signed the form which the agent also signed. Exhibit 2 is a form for consent to interview with a polygraph (Tr. p. 70). No threats were made by the agents to Beckwith nor were promises made. At no time did defendant indicate he did not wish to continue to speak with the agents (Tr. p. 71).

During the polygraph exam, the agent observed measurements that were different. After the exam, the examiner told Beckwith there was a problem with the question on the Denver bank robbery and the response was deceptive (Tr. pp. 72–74). Beckwith was insistent that the red dye stained money did not come from the Denver or a Colorado Bank robbery. He said it may come from a robbery outside of Colorado. Defendant wanted to be retested (Tr. p. 74). He said he was being truthful and the agents were wrong about defendant possibly participating in the Denver robbery (Tr. p. 75).

At the first interview by Agent Castro in the Denver county jail, on September 5th, no *Miranda* or other warning was given defendant (Tr. p. 75). Agent Michael Howell was with Agent Castro at that time. No tape recording of the conversation was made (Tr. pp. 75–76). Defendant spoke to someone from the FBI on three occasions. One, the day of the defendant's arrest, second, to

Agent Castro on September 5, 1996, and third, at the time of the polygraph exam (Tr. p. 76). Defendant agreed to a polygraph examination at the time of the first conversation with Castro and at the second meeting with him (Tr. p. 77). Apparently, the defendant said he knew he was not involved in the Denver bank robbery, was facing a drug charge, and he had information that would help clear him of the Denver robbery (Tr. p. 79).

The polygraph exam reflected two deceptive responses by defendant to questions he was asked (Id.). Both related to the Denver bank robbery and not the instant charge (Tr. p. 80). After the test was completed, the examining agent told Beckwith that the examiner had a problem about the test (Tr. pp. 82–83). The defendant was deceptive about two questions. Defendant was told he needed to "come clean or else there'd be no deal." Agent Castro said he could not make a deal with Beckwith (Tr. pp. 83–84). At the September 5, 1996 meeting, Castro mentioned the need for approval by an assistant United States Attorney (Tr. pp. 85–87). The agent, on September 5, 1996, did not threaten the defendant if he did not cooperate (Tr. p. 88). The agent didn't believe that defendant had committed the Denver robbery (Id.). The agent, on September 11, 1996, told Beckwith to tell the truth or he could not be used as a witness. If he was deceptive, the agent could do nothing for him (Tr. p. 89).

The first interview of defendant by the FBI included Agent Ron Knight and a Denver officer (Tr. p. 90). Beckwith, on September 5, 1996, indicated to Agent Castro that Beckwith had information on a bank robbery somewhere else than Denver (Tr. p. 91). After the polygraph examination on September 11, 1996, the interview was terminated after back and forth discussion (Id.). Defendant stated that the dye stained money did not come from a Colorado bank robbery (Tr. p. 92). Defendant was told if he did not provide information, the drug charge would not be dropped and he could not be used as a witness because he was deceptive on the polygraph examination. The September 11 interview was terminated (Id.).

Special Agent, William Irwin, FBI, testified that in September 1996 his principal duty was as a certified polygraph examiner (Tr. p. 5).[2] In September 1996 he was asked to conduct an examination of the defendant Randy Beckwith. The examination was at the county jail and Agent Irwin and Agent Castro were present. Beckwith was present, he was not handcuffed during the examination (Tr. p. 6). On first meeting Beckwith, Irwin introduced himself, advise of rights was given to Beckwith and in compliance with FBI policy, the defendant was advised as to his status during the polygraph exam. The advice of rights form (FD 395) was read and reviewed with Beckwith, as was the consent to polygraph form (FD 328) (Exhibits 1 & 2) (Tr. p. 7). Beckwith and the agent signed the forms (Tr. p. 8). There was a significant discussion about the defendant's rights and defendant, who is a paralegal, wanted to make certain the agent understood that the defendant knew his rights and he was not going to be tricked. Defendant also indicated his willingness to be given a polygraph examination (Tr. pp. 8–9). He waived his rights and was willing to talk. He wanted to talk about the Denver bank robbery but not other matters (Tr. p. 9). The person with whom defendant had been arrested bore a strong resemblance to the bank surveillance photographs from the Denver robbery. The agents wanted to clear Beckwith of that robbery before any further discussions. Defendant was not a suspect (Tr. p. 9). This discussion occurred prior to the administration of the polygraph exam. Beckwith made it clear he had information in which the FBI would be interested and that he wanted to talk and make a deal (Tr. p. 10). He wanted to use his information as leverage to get out of his heroin possession charge. There was a substantial discussion before the test, which lasted about an hour (Tr. p. 11). The test was administered and the interview continued about the Denver bank robbery (Tr. pp. 11–12). When he was told he was deceptive, Beckwith said it wasn't possible (Tr. p. 12).

The post examination interview lasted about an hour, going over the same issue, and then it terminated (Tr. p. 13). Defen-

dant did not say he didn't want to keep talking (Tr. p. 14). Beckwith was comfortable during the interview. Beckwith never said where he got the red dye stained money, he only made insinuations (Tr. p. 14).

The polygraph examination was run in two series. One series consisting of three charts and one zone of comparison test, a fourth chart (Tr. p. 20). Beckwith was deceptive on at least one question (Tr. p. 21), and apparently two with regard to the Denver bank robbery (Tr. pp. 23–24). The agent examiner told defendant he was deceptive to questions five and seven which were relevant questions (Tr. pp. 27–32). The agent did not become aggressive or threaten the defendant (Tr. pp. 33–34). Agent Irwin did not refer to Agent Castro as a "bulldog" that would pin something on Beckwith (Tr. p. 34). The examiner agent was not authorized to make any deal (Tr. p. 36). Beckwith never said he wanted a lawyer, he did indicate that if it took an assistant United States Attorney to make a deal that he wanted to talk to one (Tr. pp. 36–37). No threats were made to get Beckwith to speak about Dale Robbins, who was the person with Beckwith when he was arrested (Tr. p. 37). At no point did defendant invoke his right to an attorney (Tr. p. 38). The examiner agent did not call Beckwith a "liar" (Tr. p. 39). The agents did not play good cop/bad cop with Beckwith (Id.). Agent Castro was a spectator during the polygraph examination (Tr. p. 40). Beckwith became agitated at one time (Tr. p. 41). The agents acted professionally during the interviews (Tr. p. 42).

Questions five and seven of the test questions, during the polygraph exam, were those which related to the Denver bank robbery. Questions four and six were unrelated and are called control questions (Tr. p. 46). The examination technique was administered in a standard fashion (Tr. pp. 46–48). There were no trick questions (Tr. p. 49).

Agent Scott D. Montefusco, FBI, testified he was a case agent for the robbery in this case. On March 5, 1996 a federal warrant was issued for defendant for a probation

2. The transcript references are to Agent Irwin. References to Officer Bloodworth and defendant Beckwith are from the hearing on January 23, 1998.

violation. However, neither of the two Denver arresting officers knew anything about the warrant (Tr. p. 52).

Officer Harry Henry Bloodworth, Denver Police Department, testified that on August 30, 1996 (Tr. p. 59) he made a traffic stop of Beckwith and Dale Robbins. A citation was issued to Robbins for expired plates and no proof of insurance. Before pulling the vehicle over, the vehicle went through a turn lane without signaling (see Exhibit B). Once behind the vehicle Bloodworth noticed the vehicle plates were expired and there was a broken window. The vehicle was stopped for the traffic violations (Tr. pp. 55–56). Robbins was asked to exit the vehicle (Tr. p. 62). The stop was on the 2000 block of Broadway, southbound (Tr. p. 57). Robbins was questioned by Officer Bloodworth on the driver's side of the vehicle, towards the front. An NCIC check was run on Robbins and Beckwith. The report was negative (Tr. p. 61). Beckwith was arrested for false information under a Denver ordinance. There is also a false information statute in Colorado [3] (Tr. p. 63). The court took judicial notice of the Denver Ordinance (Tr. p. 64). The ordinance, Sec. 38.40 provides:

It shall be unlawful for any person knowingly and willfully to give false information to an officer or employee of the city when such officer or employee is acting in their official capacity, concerning the identity of any person participating in, connected with, or responsible for, or concerning the manner of the commission of, any act, when, as part of their official duties or employment, such officer or employee is investigating:
1. The legality of such act; or
2. The identity of the person participating in, connected with, or responsible for the commission of such act.

Defendant Randy Lee Beckwith testified that the area of his being stopped on August 30, 1996 was in downtown Denver. He was wearing sunglasses (Tr. p. 67). He wore them until later on in the day when an FBI agent told him to take them off (Tr. p. 68). The first time the defendant talked to the FBI, on the day of his arrest, he was given a *Miranda* warning (Tr. p. 68).

Defendant was interviewed on September 5, 1996 in the Denver County jail and on September 11, 1996 he took a polygraph test (Tr. p. 68). Beckwith was not given a *Miranda* warning on September 5 (Tr. p. 69). On September 11th, there were two FBI agents present. An hour was spent setting up the test. Written questions were given to Beckwith to which he objected. The agents told Beckwith that with cooperation and taking the polygraph test that they would assist him with his federal probation violation and they would talk to the district attorney about the drug charges. He also sought to remove the suspicion about a possible involvement in the Denver bank robbery. This was first mentioned by Beckwith before the polygraph test on September 5 (Tr. p. 70). Prior to the test on September 11, the agents were amicable, Beckwith was comfortable (Tr. p. 71). After the test was administered, which was twice, Agent Irwin spun Beckwith's chair around and told him he was lying about the Hampton (Denver) bank robbery. Beckwith was angry and perturbed. There was good cop/bad cop pressure. Irwin told Beckwith he'd get thirty years (Tr. p. 72). They were face to face and Irwin was swearing. Agent Irwin said Beckwith better talk or Irwin would bury defendant (Tr. p. 73). Defendant did request ... either [they] initiate what "we originally bargained or that" he "get an attorney." (Tr. p. 73). The agent said it was not possible until they talked to the United States Attorney. Beckwith knew the law and his rights and he would not say anything incriminating. He demanded to see a lawyer (Tr. p. 73). Beckwith persisted he was innocent of the Denver bank robbery (Tr. p. 74). The agents asked Beckwith where he got the

---

**3.** § 18–8–111(1)(d) Colorado Revised Statues makes it a Class 3 misdemeanor if a person "knowingly provides false identifying information to law enforcement authorities." False identifying information means a "person's name." Id. 111(3). The government contends this statute should be applied to the defendant's arrest. However, Officer Depew specifically testified that he arrested defendant for a violation of the Denver City ordinance not the Colorado law. The Government admitted this at oral argument and did not raise the Colorado statute until the submission of its final post hearing memorandum (File Entry # 101, July 2, 1998).

money he had in his possession. He had knowledge where it came from, he never said it came from a particular place or robbery, but it did not come from the Denver robbery (Tr. p. 75). The questioning went on for twenty minutes after defendant asked for a lawyer. The defendant asked for a lawyer three times. Defendant said Agent Castro took the polygraph straps off defendant, spun his chair around, and in defendant's face said to defendant to quit lying, tell the truth or he was going to get 25 to 30 years (Tr. p. 75). Defendant was afraid (Tr. p. 76). He thought he might be indicted for something he didn't do. He was indirectly afraid for his physical safety (Tr. p. 76). He felt physically threatened (Tr. p. 77). Beckwith has spent quite a few years in prison (Tr. pp. 77–78). The agents did not draw their guns (Tr. p. 78).

Defendant wanted to talk to the police from the very beginning when arrested (Tr. p. 79). When Officer Depew directed defendant to get out of the car, the officer did not touch the defendant (Tr. p. 81). The first *Miranda* warning given by an FBI agent was about an hour after the defendant's arrest (Tr. p. 82). Defendant said nothing at the time. They told defendant he had a parole violation. Defendant did not invoke the right to silence or to a lawyer. Defendant was on parole from a federal bank robbery conviction (Tr. pp. 83–84). Defendant wanted to talk to the police or FBI for several reasons; he had concern over his parole; he was concerned over the money and concern over the drug charge because of Colorado's "three strikes" law (Tr. p. 84). The agreement to take the polygraph exam was voluntary "under certain parameters." The defendant did not say he wanted to stop the exam (Tr. p. 86). Defendant was promised that he would be taken out of the jail and then to Englewood (a federal correctional institution) for a parole violation. The promise was oral. In exchange, defendant was to give the source of the dye stained money. No such information was provided (Tr. p. 86), because the agents couldn't make a deal (Tr. p. 87). However, they said they could make the state charges go away and remove defendant to Englewood (Tr. pp. 87–88).

Based on the evidence the court enters the following:

### Findings of Fact

1. On August 30, 1996, Denver City police officers Wayne C. Depew and Harry H. Bloodworth were conducting patrol on Broadway, a high crime area of downtown Denver. Officer Depew observed a four door silver Nissen, in bad condition, with a back window out, that was in a turn lane. Instead of turning, the vehicle pulled straight into the lane of traffic without signaling. This was a violation of a Denver City traffic ordinance. The officers pulled in behind the vehicle for the traffic violation and observed the vehicle also had expired California plates. The officers stopped the vehicle which was being driven by Dale Robbins. Defendant Randy Lee Beckwith was a passenger in the front seat. Officer Bloodworth approached the driver and because the area was considered a dangerous high crime area, Officer Depew exited the vehicle and went to the passenger side of the vehicle where defendant Randy Lee Beckwith was located.

2. In the rear of the vehicle was clothing, a bottle of Clorox bleach and discolored rags with red stains on them. Depew initiated a conversation with Beckwith but did not suspect defendant of a robbery. The officer asked the defendant his name and he replied he had no ID on him. The officer asked Beckwith to exit the vehicle, which he did. A pat down was conducted. Nothing was found or seized. Beckwith seemed nervous. Defendant told the officer his name was Christopher Ayer, born September 8, 1952. Because of the out of state plates, the officer asked Beckwith where he lived and was staying and defendant said a motel on South Broadway in Denver, but he could not give a name or address. The purpose of the inquiry was to field card the defendant so that the police department would have knowledge of who is in the area. The inquiry was not related to the reasons for the stop of the vehicle or an investigation of a crime. It was an encounter during the vehicle stop and the inquiry was for information. Beckwith said he had just met the driver. The officer told

Beckwith to get beck into the vehicle which he did.

3. Officer Depew walked around to where Officer Bloodworth was talking to the driver and Depew spoke to Dale Robbins. Depew asked Robbins the name of the passenger and Robbins said "Randy." Robbins also told Depew they were staying at a motel on Broadway. Depew went back to the defendant and told him he was under arrest for giving false information to a police officer. The officer intended to arrest under Denver City Ordinance Section 38–40, not Colorado state law, CRS 18–8–111. Defendant was told why he was under arrest. A search of defendant produced a large quantity of cash in the defendant's front pant's pocket. Twenty dollar bills, discolored with red dye, were found. In another pocket a small amount of black tar heroin was found. This was a felony narcotics violation under Colorado law. While Officer Depew was placing the defendant in the police vehicle, the officer observed a brown wallet laying on the concrete. Defendant had apparently attempted to push it under the vehicle. It was Beckwith's wallet and was bulging with twenty dollar bills, photographs, and papers of defendant.

4. Defendant was taken to the police station. During the ride, defendant was moving about. Defendant was attempting to remove his wallet and the officer removed it and put it in the defendant's shirt pocket. Following defendant's arrest Officer Depew gave the defendant a *Miranda* warning, however, the warning did not advise defendant he could have an attorney if he could not afford one. During the ride to the police station, the defendant volunteered that he would like to help the police make drug buys. Those comments were spontaneous. Defendant was taken to a vice squad holding cell. Officer Depew observed a large amount of cash on the floor. The cash in defendant's shirt was not there and defendant was attempting to push the money under a bench. The driver of the Nissen vehicle, Robbins, was cited for no insurance and expired plates and allowed to leave the scene of the stop.

5. Defendant was interviewed by the FBI on the day of his arrest and given a *Miranda* warning. Apparently defendant did not make a statement and nothing was said. Defendant had given information to Denver officers that he would like to speak to FBI agents. The defendant was anxious to make a deal.

6. The defendant was contacted by Agent Michael Castro, FBI, because Denver officers had told Castro about Beckwith and the dye stained money. Castro was working bank robberies and Castro was advised that Beckwith was cooperative and willing to give information. The contact of Beckwith by Agent Castro was on September 5, 1996 at the Denver County Jail where Beckwith was being held. The agent was interested in Beckwith being a witness to a Denver bank robbery. The agent told Beckwith he would like him to be a witness. The agent could not promise anything and a deal would have to be worked out with the prosecutor and counsel. The agent asked Beckwith to take a polygraph examination. No *Miranda* or other warning was given to defendant at the interview. No threats were made and defendant wanted to take the polygraph examination and possibly obtain the dismissal of the state drug charge, to help on his alleged parole violation, and to take suspicion off him on a Denver bank robbery. At this time, defendant insinuated he may have information about a bank robbery other than the Denver robbery. The conversation lasted ten to fifteen minutes.

7. As a result of the conversation between Agent Castro and the defendant, and defendant's willingness to take a polygraph examination as part of the efforts of defendant to make a deal, a polygraph examination of the defendant was set for September 11, 1996 at the Denver County Jail. FBI Agent William Irwin, a polygrapher, conducted the proceedings and the testing process on Beckwith. Agent Castro and Beckwith were the only other persons present other than Irwin. Defendant was given a *Miranda* warning from an FBI form (Pla.Exh. 1). The form was read and explained to the defendant. The defendant executed the form waiving his *Miranda* rights. The advice given fully complied with *Miranda*. A second form, Consent to Interview With

Polygraph, was provided to defendant and he executed it consenting to the polygraph examination. The defendant wanted the examination because he strongly asserted he was not involved in the Denver bank robbery and defendant wanted to make a bargain with the FBI. Defendant was not a suspect in the Denver robbery, but the other person in the vehicle with defendant, when he was arrested, bore a strong resemblance to the bank robber.

8. During the polygraph examination and post examination interview, Beckwith was comfortable. He was not threatened and no force was employed against him. He was not told to speak or he would be buried. Beckwith became agitated and upset when the examiner, Irwin, told Beckwith that the examination showed he was deceptive on two responses pertaining to the Denver bank robbery. Defendant did not invoke his right to silence or to an attorney during the examination or interview. No threats were made to defendant to get him to speak about Dale Robbins or any other bank robbery. Beckwith was not called a "liar" or threatened with a severe sentence by the FBI agents "unless Beckwith cooperated." No intimidation techniques were used or force employed for the interview. Beckwith was told that the agents did not have authority to make a deal and that such a circumstance could only occur through the United States Attorney's office. Beckwith was a trained paralegal who knew his rights and was also a person who had had prior encounters with law, legal proceedings and law enforcement personnel. He knew of an outstanding federal parole or probation warrant. Because an agreement could not be made and defendant was believed by the agents to be deceptive, the interrogation on September 11, 1996 was concluded.

9. Defendant Beckwith had been interested in striking some kind of a deal from the time of his original arrest. There was a probation or parole violator's warrant outstanding for Beckwith when he was arrested by the Denver police. Denver officers knew nothing of the warrant when Beckwith was arrested, but he was made aware of the outstanding warrant soon thereafter. Defen-

dant wanted to eliminate himself from suspicion in a Denver bank robbery. At the September 11, 1996 session, defendant Beckwith was aware of his *Miranda* rights, waived his preinterrogation rights and consented to taking a polygraph examination. Beckwith was anxious to participate, to work out a deal to be exonerated of the Denver bank robbery, to have his state drug charge dismissed and to gain some benefit on his outstanding alleged probation violation. The chance of a deal broke down when the polygraph examination of Beckwith indicated he was deceptive as to the Denver bank robbery. Defendant made an insinuation that he might know where dye stained money came from or about another non Colorado bank robbery.

### Discussion

### The Stop

■ The facts show the vehicle in which the defendant was riding on August 30, 1996, was lawfully stopped for two traffic violations. First the vehicle, driven by Dale Robbins, drove through a turn lane into a direct lane of traffic without signaling in violation of a Denver City ordinance. (See Defendant's Exhibit B). Second, the vehicle had expired California plates which is a violation of Colorado law. ColoRev Stat. §§ 42–3–128, 42–3–133. Consequently, the stop of the vehicle by the Denver officers was lawful. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir. 1995); *United States v. Hunnicutt,* 135 F.3d 1345 (10th Cir.1998); *United States v. Villa–Chaparro,* 115 F.3d 797, 801 (10th Cir. 1997)("Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." It is irrelevant "that the officer may have had other subjective motives for stopping the vehicle.").

### Detention and Arrest

■ Following the stop of the vehicle, Officer Depew approached the passenger side of the vehicle and initiated a conversation with Beckwith. Officer Depew asked defendant for his name and defendant replied

that he had no "ID." The officer then asked defendant to exit the vehicle. This was permissible. Asking the vehicle passenger's name was a mere police citizen encounter which required no suspicion. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Simmons*, 918 F.2d 476 (5th Cir.1990). It was permissible for the officer to ask the passenger to exit the vehicle during the traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). In *Wilson* the court said once a motor vehicle has been lawfully detained for a traffic violation, the police officer "may order passengers to get out of the car pending completion of the stop." 519 U.S. 408, 117 S.Ct. p. 886. Officer Depew made a pat down and found nothing.[4] The defendant then gave the officer defendant's name of Christopher Ayer and a date of birth. The officer's inquiry was to gather information for a "field card" of the defendant because of the out of state plates on the vehicle and so officers would know who was in the area. The inquiry was apparently not for the purposes of the traffic violations or any act that defendant had committed. After gathering the information he sought, Officer Depew asked defendant to get back in the vehicle and the officer went to where Officer Bloodworth was dealing with the driver. Depew asked the driver, Dale Robbins, questions including the name of defendant. Robbins said defendant's name was "Randy" which was not a name defendant gave. The officer concluded defendant had given the officer a false name and that Denver City Ordinance 38–40 had been violated. The officer then arrested the defendant for the ordinance violation.

■ Defendant contends the arrest was without probable cause and that there had been no violation of the Denver City Ordinance. An officer may arrest on probable cause. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)("A police officer

may arrest a person if he has probable cause to believe that the person had committed a crime."); *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The standard is an objective standard, Id., however the officer's experience and training may be credited in determining whether probable cause exists. *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) the court observed:

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "

> \* \* \* \* \* \*

> ... and probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found ...

> \* . \* \* \* \* \*

They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed. [*Illinois v.*] *Gates*, supra, [462 U.S. 213] at 232, 103 S.Ct. [2317], at 2329[, 76 L.Ed.2d 527 (1983)]; *Brinegar*, supra at 175, 69 S.Ct. at 1310 ("The standard of proof [for probable cause] is ... correlative to what must be proved"); *Ker v. California*, 374 U.S. 23, 33, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963) ("This Cour[t] [has a] long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application"); "[e]ach case is to be decided on its own facts and circumstances" (internal quotation marks omit-

---

**4.** The pat down of defendant was probably improper as there was no factual basis on which to conclude defendant was a danger to the officer. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There is no reason why a person of ordinary caution would see the danger warranting such action. However, nothing was found or seized and matter is of no consequence to this case.

ted)); *Terry v. Ohio*, supra, at 29, 88 S.Ct., at 1884 (the limitations imposed by the Fourth Amendment "will have to be developed in the concrete factual circumstances of individual cases").

■ The standard is one of an "objectively reasonable police officer." *Id.*, 517 U.S. 690, 116 S.Ct. p. 1661–62. In *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) the court said probable cause for an arrest exists "if 'at the moment the arrest was made ... the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that" an offense had been committed. *Id.* p. 228, 112 S.Ct. 534, citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Indisputable or necessarily convincing evidence is not required, only "reasonably trustworthy information." *Easton v. City of Boulder*, 776 F.2d 1441 (10th Cir.1985); *United States v. Hugaboom*, 984 F.2d 1083 (10th Cir.1993)(the evidence must warrant a prudent officer in the belief that an offense has or is being committed). See also *United States v. Alonso*, 790 F.2d 1489 (10th Cir.1986); *United States v. Guerrero–Hernandez*, 95 F.3d 983 (10th Cir.1996).

■ In this case, Officer Depew had probable cause to believe defendant had given him a false name. Before responding to the officer's question, defendant said he had no "ID." He said he was staying with the driver in a motel on South Broadway. The defendant was a passenger in the driver's vehicle which looked like it had been lived in. The driver, who was with defendant and had been living with the defendant for a few days, stated the defendant's name was Randy. Under the circumstances this statement could be credited.

However, as said in *Ornelas*, supra, the "standard of proof [for probable cause] is ... correlative to what must be proved." 517 U.S. 690, 116 S.Ct. at 1661. This requires an examination of the test of the Denver City Ordinance 38–40. It provides:

It shall be unlawful for any person knowingly and willfully to give false information to an officer ... when such officer ... is acting in [an] official capacity concerning the identity of any person participating in, connected with, or responsible for, or concerning the manner of the commission of, any act, when, as part of [an officer's] official duties ..., such officer is investigating:

1. The legality of such act; or

2. The identity of the person participating in connection with, or responsible for the commission of such act.

The ordinance is not a mere false information to an officer provision.[5] Rather it applies only when the officer is acting in an official capacity concerning a person [involved in or connected with] an act, and the officer is investigating the legality of the act or the person participating, connected with or committing the act. In this case, the only "act" was the illegal operation of the vehicle. This was not the "act" of defendant, Beckwith. Further, Officer Depew's questions were not directed to investigating any "act." The officer was field carding the defendant for information purposes. The inquiry was unrelated to the act that Officer Bloodworth was investigating. Officer Depew was gathering information as to defendant's status. Therefore, there was no violation of the Denver City Ordinance and defendant's arrest was unlawful and without probable cause.

### Search Incident to Arrest

■ Officer Depew conducted a search of the defendant following his arrest. A large quantity of cash was found in defendant's front pant's pocket. That evidence was acquired illegally from the warrantless search incident to an illegal arrest because of the lack of probable cause and must be suppressed. *Beck v. Ohio*, supra; *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *United States v. Welker*, 689 F.2d 167 (10th Cir.1982). The small amount of heroin found on defendant must also be suppressed as well as any references

---

**5.** Contrast C.R.S. 18–8–111. This provision has no application in this case because it was not the

basis for Officer Depew's arrest of defendant.

to it, except as the arrest may otherwise be attenuated from such reference. The defendant's wallet, actions in regard thereto, and the case on defendant's wallet must be suppressed as acquired incident to an illegal arrest.[6]

### Defendant's Statements To Officer DePew and an Unidentified FBI Agent On August 30, 1996

Following defendant's arrest, he was given an incomplete *Miranda* warning by Officer Depew. However, the officer did not interrogate defendant. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). If defendant had been interrogated, the incomplete *Miranda* warning and the prior illegal arrest would have warranted suppression of any statement defendant gave at that time *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

■ However, defendant made spontaneous statements about a desire to make drug buys for the Denver narcotics officers. Spontaneous statements are not within the *Miranda* governance and would be admissible inspite of a deficient warning. *United States v. Bautista*, 145 F.3d 1140, 1146–47 (10th Cir.1998); *United States v. De La Luz Gallegos*, 738 F.2d 378, 381 (10th Cir.1984); *United States v. Smith*, 776 F.2d 892 (10th Cir.1985); *United States v. Gay*, 774 F.2d 368, 379 (10th Cir.1985).

■ However, defendant was, at the time, in illegal custody. If the statements were the product of the illegal arrest, they may still be subject to suppression even if spontaneous for *Miranda* purposes, unless attenuated from the Fourth Amendment violation. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However,

that issue need not be addressed because defendant's statements are not logically probative of the bank robbery in this case, and could be prejudicial if brought out at trial. Rule 403, F.R.E. The relevance of what was said is only to this motion to show defendant's desire to make a deal.

The defendant was also questioned by an unidentified FBI agent on the day of defendant's arrest. Defendant testified that at that time, he was given a *Miranda* warning. He has not challenged the adequacy of the warning. Rather, defendant merely said he did not say anything. Therefore, the issue of anything said at that time, has not been contested or preserved and suppression will not be considered.

### Statements To Agent Castro on September 5, 1996

When defendant was first arrested, it was for violation of Denver City Ordinance 38–40. However, when the heroin was found on his person, defendant was apparently charged with a felony drug offense under Colorado law. The charge was tainted by the initial illegal arrest. Defendant wanted to make a deal with the FBI in hopes of eliminating the Colorado drug charge and apparently on August 30th, or around that time, indicated a willingness to cooperate. Defendant was also motivated by other considerations as well. Agent Castro was advised of defendant's cooperativeness and determined to talk to defendant at the jail.

■ The defendant was brought to a room at the jail where Agent Castro talked to defendant. No *Miranda* warning was given, although defendant was in custody. See *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)(questioning suspect in jail as to an offense different than the reason for confinement was custodial requiring a *Miranda* warning). *Miranda*, is not

---

**6.** Beckwith attempted to get rid of the wallet and it was observed by Officer Depew in plain view. Abandonment may remove the taint of an illegal search, *United States v. Boone*, 62 F.3d 323 (10th Cir.1995). However, abandonment must be voluntary. If the product of a Fourth Amendment violation is the effort to get rid of incriminating evidence the action is not voluntary. *Smith v. Ohio*, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990); *United States v. Nicholson*, 144 F.3d

632, 640 (10th Cir.1998) p. 8; *United States v. Garzon*, 119 F.3d 1446, 1451 (10th Cir.1997). Although the circumstances in this case might be akin to the situation in *Boone*, see also *United States v. Morgan*, 936 F.2d 1561 (10th Cir.1991), the government has not relied on abandonment and the court will not consider the question *sua sponte*. The case also is akin to the situation in *United States v. King*, 990 F.2d 1552 (10th Cir. 1993) where the court found no abandonment.

offense specific and a warning must be given for any custodial interrogation. *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *United States v. Bautista,* supra. The fact that defendant was not the "focus" of a crime, is not relevant. *Miranda,* supra, n. 4. The government has not made a showing that any proper, prior warning was effective. Consequently, even if the September 5th questioning could be considered attenuated from the illegal arrest, the absence of a *Miranda* warning and waiver requires suppression of any statement made to Agent Castro on September 5th. Attenuation will not be considered as to such statement.

However, it should be noted that there are no facts that any conduct on the part of Agent Castro on September 5, 1996 would have rendered any statement defendant made involuntary. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Erving L.,* 147 F.3d 1240 (10th Cir.1998); *United States v. Alvarez,* 142 F.3d 1243 (10th Cir.1998).

### Statements Made on September 11, 1996

Because of defendant's willingness and desire to cooperate with the FBI, he was considered a potential witness or informant. However, in order to judge the credibility of the information the defendant may provide, he was asked to undergo a lie detector examination. The defendant was willing and eager to take the exam in order to work a favorable deal. Arrangements were made for a polygraph examination to be taken at the Denver County Jail. The exam was administered by Special Agent William Irwin, FBI, a polygrapher.

Defendant was informed of his *Miranda* rights and a written rights and waiver form was executed by defendant. He also voluntarily executed a "Consent To Interview With Polygraph." In each instance defendant acknowledged a waiver of his rights. The examination was performed and was willingly and voluntarily taken by the defen-

dant. He knew the questions to be asked. According to Irwin the test indicated defendant was deceptive with regard to two questions pertaining to the Denver bank robbery.[7] As a result, a discussion took place between defendant, Agent Irwin and Agent Castro, who was present. This was in an effort to still work out a deal.

■ Because the polygraph examination and interview was preceded by a *Miranda* warning, which was not tainted by other interrogations where no *Miranda* warning were given, and on the prior occasions no involuntary statements were taken, the interrogation in this case satisfied *Miranda* requirements. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982); *United States v. McCurdy,* 40 F.3d 1111, 1115–18 (10th Cir.1994); *United States v. Hall,* 805 F.2d 1410, 1414 (10th Cir.1986). Therefore, the defendant's statements on 11 September, 1996 are not inadmissible because of the prior *Miranda* violation on September 5th. No basis exists to conclude that there was any deficiency in the *Miranda* warnings or waiver, *Elstad,* supra.

■ Defendant contends the post polygraph exam statements of defendant were involuntary and inadmissible as the product of coercion and promise. He also contends he invoked his right to counsel. The argument must be rejected. The mere taking of a polygraph exam is not proper or coercive. *Wyrick v. Fields,* supra. The defendant wanted to take the exam and to pass it in order to make a deal with the government. After the polygraph exam defendant was told of the fact that he had registered deceptive on two questions related to the Denver bank robbery. Defendant disputed that he was deceptive or not telling the truth. Informing defendant of the results of a polygraph exam does not constitute misconduct or overreaching sufficient to raise an issue of an involuntary confession *Wyrick,* supra. *Colo-*

7. The government has not indicated it would seek to introduce the results of the polygraph examination. It would not be relevant and absent a showing that the test was admissible under Rule 702, F.R.E., as scientific evidence, the results of the exam would be inadmissible. *United States v. Call,* 129 F.3d 1402 (10th Cir.1997). See also *Palmer v. City of Monticello,* 31 F.3d 1499 (10th Cir.1994); *Chatwin v. Davis County,* 936 F.Supp. 832 (D.Utah 1996).

rado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). There is no evidence to support a conclusion that Agent Irwin lied or misstated the results of the examination

 The court has found there were no threats, promises or good cop/bad cop psychological interrogation methods employed.[8] Therefore, there is no misconduct that meets the Colorado v. Connelly, supra, standard. No unambiguous and unequivocal request for counsel was made by defendant. Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). At best, defendant knew a deal could not be made except with approval of the assistant United States attorney and defendant may have requested such a person. However, that is not a request for counsel. Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); State v. Galli, 967 P.2d 930 (Utah 1998) pp. 3–4 ("Likewise we hold that defendant's request to speak to a prosecutor does not constitute even an equivocal assertion of the right to counsel. Thus police are free to continue to question a suspect who has only requested to speak to a prosecuting attorney.")(citing cases). The statements made by defendant, when considered under the totality of the circumstances, were voluntary and part of an effort to make a deal. Colorado v. Connelly, supra; United States v. Alvarez, 142 F.3d 1243 (10th Cir.1998)(statement by college educated person in course of considering a deal is voluntary); United States v. Toro–Pelaez, 107 F.3d 819 (1997); United States v. Glover, 104 F.3d 1570 (10th Cir. 1997); United States v. Hernandez, 93 F.3d 1493 (10th Cir.1996); United States v. Headdress, 953 F.Supp. 1272 (D.Utah 1996). It should be remembered defendant is a paralegal and a person with prior experience in the criminal justice system. Defendant is not entitled to suppression of statements made on September 11, 1996 based on a claim they were involuntary.

***Defendant's Status***

At the time of the defendant's interrogation and polygraph exam on September 11, 1998, defendant was being held in Colorado State custody based on a narcotics charge against him. Although defendant had an outstanding federal probation or parole violation warrant pending, that warrant had not been served pending resolution of the Colorado charge. The defendant was in custody on the narcotics charge. The heroin had been found because of an illegal arrest and defendant's continued custody was in violation of the Fourth Amendment. The question is presented as to whether the original Fourth Amendment violation on August 30, 1996 tainted the statements of defendant made to Agent Irwin and Castro on September 11, 1996. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); Lanier v. South Carolina, 474 U.S. 25, 106 S.Ct. 297, 88 L.Ed.2d 23 (1985)(fact that confession is voluntary and Miranda warnings were given and understood is not alone enough to purge the taint of an illegal arrest).

The next issue arises as to whether the circumstances of this case require exclusion of defendant's September 11, 1996 statements or whether the taint of the illegal arrest on August 30, 1996 was attenuated by the circumstances of the September 11, 1996 interrogation.

***Attenuation***

### The Defendant's Statements of September 11, 1996

 At the time the defendant was interviewed and polygraphed by the FBI on September 11, 1996, he was being held by Colorado authorities on a controlled substance charge arising from his arrest by Officer Depew for a violation of the Denver City ordinance. The interrogation by the FBI was in no way related to that charge. That was a matter of interest to Colorado state authorities. The FBI was interested in in-

**8.** This does not mean good cop/bad cop techniques are improper. It depends on how the technique is utilized and whether the practice is so coercive to be likely to overcome a defendant's free will. Spano v. New York, 360 U.S. 315, 79

S.Ct. 1202, 3 L.Ed.2d 1265 (1959). See Delap v. Dugger, 890 F.2d 285, 295 (11th Cir.1989); Weidner v. Thieret, 866 F.2d 958, 962 (7th Cir.1989); Green v. Scully, 850 F.2d 894, 903 (2nd Cir. 1988)(must overcome free will).

formation that defendant might have on an unrelated out of state bank robbery or the Denver bank robbery and whether defendant would be a credible possible witness. Defendant affirmatively indicated a desire to speak to the FBI and was anxious to make a deal and not just on the Colorado charge, but also his federal probation or parole matter. The FBI had to also know if defendant was telling the truth about not being involved in the Denver bank robbery. None of the federal interests were related to the basis of defendant's state arrest and charge. Federal officers did not participate in the circumstance of defendant's arrest or subsequent narcotics charge. That was only collaterally of interest in maybe making a deal if defendant was credible.

▉ Normally, when a person is illegally arrested, statements given by the person as to the offense for the arrest, are not admissible. *Brown v. Illinois,* supra; *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Taylor v. Alabama,* supra, *Lanier v. South Carolina,* supra. However, see *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (Fourth Amendment violation does not bar statements made outside home, Rule in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) which was violated was designed to protect the integrity of the home, not exclude statements made outside the home).

However, the rule of exclusion is not a *per se* rule but depends on the circumstances and on whether those circumstances show sufficient attenuation from the constitutional violation that the subsequent evidence should be admitted.

In *United States v. Carson,* 793 F.2d 1141 (10th Cir.1986) the court explained the concept and the limitation on exclusion of evidence derived to some extent from a primary illegal activity. The court said:

Nonetheless, ..... even though evidence would not have come to light but for prior illegal police conduct, such evidence is not inadmissible per se: We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417. The rule of *Wong Sun* is quite clear: evidence should not be excluded as a "fruit of the poisonous tree" simply because it comes to light as a result of prior illegal police activity; rather evidence, the knowledge of which is obtained as a result of prior police illegality, is admissible so long as (1) it has not been subsequently obtained through exploitation of that illegality, or (2) it has been subsequently obtained by means sufficiently distinguishable from the prior illegality to purge the evidence of the taint. Accord, *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

793 F.2d at 1148.

A "but for" standard is not the measurement. *Id.* p. 1148.

In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) the court stated that the proper inquiry is whether the evidence was obtained through "exploitation of the primary illegality" so as to purge the evidence of its taint. In this case, the primary illegality was not involved in the September 11th inquiry. That inquiry involved an unrelated matter. The inquiry was involved with whether defendant could cooperate and the FBI agents pursued that matter. Although his interest did involve the Colorado drug charge, it was broader than that specific matter. As far as the inquiry involved defendant's interest in the drug matter, the United States had no interest in it at all. This is not an exploitation of the primary illegality which was the improper arrest for giving a false identity to a Denver officer or the eventual drug charge.

▉ In *Brown v. Illinois, supra,* the Supreme Court identified three factors for consideration in evaluating a claim of attenuation. First, is the time elapsed between the

illegal activity and the evidence acquired 422 U.S. at 603, 95 S.Ct. 2254. In this case about 12 days had expired since defendant's illegal arrest by the Denver officer. Although *Miranda* warnings will not alleviate the taint of an illegal arrest, *Id.* pp. 601–602, 95 S.Ct. 2254, where proper *Miranda* warnings are given, different officers are involved in the interrogation than those involved in the arrest, a different subject matter is involved, and the location is away from the place of arrest, the time lapse issue supports a conclusion of attenuation. *United States v. Manuel,* 706 F.2d 908, 912 (9th Cir.1983); *United States v. Daniel,* 932 F.2d 517, 521 (6th Cir.1991).[9]

The second consideration identified in *Brown* is the presence of intervening circumstances 422 U.S. at 603–04, 95 S.Ct. 2254. They are obvious in this case. The defendant's desire for and initiation of contact with the FBI and his interest in avoiding the federal warrant. The circumstances of the inquiry involved a different offense unrelated in any way to the Colorado offense.

The third factor in the *Brown* analysis is the purpose and flagrancy of the arresting officer's misconduct. 422 U.S. at 603–04, 95 S.Ct. 2254. Officer Depew's conduct in this case was not a flagrant abuse of authority. Defendant did give a false name to the officer and the officer made what was a mistaken interpretation of the Denver City Ordinance (38–40) that made the arrest illegal.[10] The evidence in question (September 11, 1996 statement) was not developed from the arrest. The officer did not make a flagrant intrusion into defendant's privacy but made a standard search incident to arrest. The officer left the dye stained money defendant had in his possession with him and the officer was not interested in any bank robbery. The third element supports a conclusion of attenuation.

In *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) where the Supreme Court recognized the potential application of attenuation circumstances in a proper case, the court said "As a matter of *good sense,* however, such connection [causal connection] may have become so attenuated as to dissipate the taint." (Emphasis added). *Nardone* did not elaborate on what the court meant. Some courts have suggested that where the illegal action only causes a police agency to focus attention on a suspect, attenuation is more appropriately found. *Gissendanner v. Wainwright,* 482 F.2d 1293 (5th Cir.1973); *United States v. Watson,* 950 F.2d 505 (8th Cir.1991). In this case, there is no evidence the FBI agents who received defendant's statements on September 11, 1996 knew of any illegality as to defendant's arrest. At best, the agents were directed to defendant after his arrest and due to some extent because of defendant's own interest and request.

In *United States v. Ward,* 961 F.2d 1526 (10th Cir.1992)[11] the court adopted the factors of *Brown* as the proper attenuation concept to be applied when a Fourth Amendment violation occurs followed by an alleged consent search. The court used the term "separation" between the Fourth Amendment violation and the actions of defendant. *Id.* p. 1535. The court said "There were no intervening circumstances that would break the *nexus* between the illegal act and the production of evidence. (Emphasis added)." *Id.* p. 1536.

In *United States v. Hill,* 60 F.3d 672, 679 (10th Cir.1995) the court said that attenuation occurs "when the use of the illegally [obtained] evidence falls, in the words of the Supreme Court, 'outside the offending officer's zone of primary interest.'" (quoting from *United States v. Janis,* 428 U.S. 433, 458, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)). In *United States v. Boone,* 62 F.3d 323 (10th

---

**9.** In *Taylor v. Alabama,* supra, the court found no attenuation where the time between the illegal arrest and defendant's statement was six hours. In *Brown v. Illinois,* supra, only two hours had expired.

**10.** The arrest may have been within the Colorado Statute, however, the officer did not arrest under

that statute and forthrightly said the arrest was under the Denver City Ordinance.

**11.** The facts of *Ward* are not apropos to this case and the main holding in *Ward* was altered by the *en banc* decision in *United States v. Little,* 18 F.3d 1499 (10th Cir.1994).

Cir.1995) the court held *defendant's conduct* affirmatively disclosing evidence by fleeing and throwing drugs from a vehicle, attenuated the effects of an illegal detention. "Yet, if the abandonment is sufficiently attenuated from [the officer's] illegal car search, the evidence may be admitted at trial." 62 F.3d at 325. The court utilized the three factor analysis in *Brown*, noting the "but for" test was not proper standard (*Id.* p. 326), and concluded attenuation had occurred.[12] See also *United States v. Waupekenay*, 973 F.2d 1533 (10th Cir.1992) (defendant's forcible conduct after officer's illegal entry was not excluded).

Of significance to this issue is *United States v. Edwards*, 103 F.3d 90 (10th Cir. 1996). The court held an intervening valid arrest expunged the taint of a prior illegal arrest. The defendant had attempted to "make a deal" (*Id.* p. 95). The court said:

> However, if the *only* reason that Edwards was "voluntarily" attempting to make a deal was because he was illegally taken into police custody, the "voluntariness" of such consent would be illusory. (Emphasis added).

The court held the test was that of whether the evidence was obtained as a result of the "exploitation" of the primary illegality. *Id.*; See also *United States v. Eylicio-Montoya*, 70 F.3d 1158 (10th Cir.1995)(same); *United States v. Montoya–Robles*, 935 F.Supp. 1196 (D.Utah 1996)(same).

In this case, when defendant was questioned by Agents Irwin and Castro, he was apparently still held on the Colorado drug charge based on the drugs found on defendant after the illegal arrest by Officer Depew. However, defendant indicated an immediate willingness and affirmative desire to cooperate and initially voluntarily spoke of assisting Denver officers in making drug buys. It was defendant who was interested in speaking with the FBI to make some kind of a deal. If the sole purpose had been to get out from under the Colorado drug

charges, *Edwards* would possibly control and the September 11th statements excluded.[13] However, defendant's testimony was to the effect that he was motivated by other concerns as well. There was an outstanding federal warrant that he was aware of and on which he wanted some consideration. He also wanted to eliminate any suspicion that he might be involved in the Denver bank robbery. These are considerations in addition to and independent of the drug charge (See Tr. p. 70, Testimony of Randy Lee Beckwith). Therefore, the statement in *Edwards* is distinguishable in this case on the basis of a reasonable fact distinction.

The court in this case has also analyzed the three factors of *Brown v. Illinois*, supra, and found that they support attenuation. In addition, a different sovereign and different crime interests support a conclusion for attenuation. *United States v. Janis*, supra. There is no evidence the FBI agents knew anything of the circumstances of the defendant's arrest by Colorado officers. Their inquiry was not in the "primary zone" of the arresting officer. *United States v. Hill*, supra. The FBI inquiry was separate from the drug case, there was a tenuous nexus at best, there was no exploitation of the primary illegality. *Miranda* warnings were given, written waiver and consent to a polygraph obtained. Defendant is a trained paralegal watchful of his own legal interests, and the interrogation was mutual and mostly cordial until the results of the polygraph examination were made known to defendant. It is concluded, therefore, that the statements of the defendant made on September 11, 1996 are attenuated from the illegality of his arrest on August 30, 1996, and therefore admissible.

### Booking Photograph

In the defendant's last memorandum submitted on the issue of attenuation he claims that the booking photograph taken at the Denver County Jail following his arrest by

---

12. A *Brown* analysis was also made in *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996) concerning the legality of a post arrest consent search.

13. *Edwards* did not consider the three factors in *Brown*. *Brown* was not cited or discussed in *Edwards*, rather the court placed its primary reliance on the text of Professor Wayne R. LaFave, *Search and Seizure* § 11.4(d) at 277 (3d Ed.1996).

Officer Depew must be suppressed. In defendant's original motion to suppress (File Entry # 28) he did not raise this issue. In that initial motion, the defendant asked to suppress any evidence "taken from him, from his person, or in and about his presence." This does not encompass the suppression of the booking photograph. There was no compliance with DUCrimR 12–1(d) with regard to motions to suppress and there was inadequate articulation of the claim for suppression of the booking photograph in the defendant's motion. Nothing in defendant's memorandum in support of his initial motion (File Entry # 29) makes reference to the booking photograph.

Defendant made a motion to suppress identification evidence which this court had denied. At no time in conjunction with that motion did defendant argue for suppression of the booking photograph.

■ In addition, at the several hearings and presentations of evidence on the motion to suppress defendant has made no inquiry or raised any issue on the booking photograph, except at the time of the oral argument on June 8, 1998 (Tr. p. 6). Defendant's first post suppression hearing memorandum (File Entry # 83) did not raise the issue. The supplemental memorandum on Fourth Amendment grounds (Point V, p. 36, File Entry # 85) only made casual reference to the booking photograph. However, defendant's final extensive memorandum contains specific analysis with regard to the matter. The government's memorandum in response did address the issue and presented analysis and argument against suppression. (File Entry # 91). Defendant submitted a reply memorandum to the government's response which addressed his claim with greater attention. Under the circumstances, the issue is foreclosed. It was not addressed in the original motion or briefing or developed at any evidentiary hearing. There was no compliance with DUCrimR 12–1(d). Also, Rule 12 F.R.Cr.P. (c) requires a motion to be filed within the time set by the court. Raising an issue for the first time in a post hearing memorandum is untimely and the motion should be denied for that reason.

■ However, assuming the matter has been adequately raised, the photograph itself may not be intended to be used at trial. The record has not been developed as to how the booking photograph applies in this case. It is not shown if it was part of the robbery victim's identification of defendant from a photo spread. The victim, Jeffrey R. Banks, may still testify to his identification of defendant at the photo showup, since that identification is remote and attenuated from the arrest. *Wong Sun,* supra; *Brown,* supra (applying the three step analysis of *Brown*).

■ Further, the booking photograph, if it was used in the photo spread, is not subject to suppression if it is sufficiently attenuated from the illegal arrest. Under such circumstance the photograph would not be subject to suppression nor would anything related to Banks' identification of defendant Beckwith.

In *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the defendant, a suspect in robbery and sexual assaults on women, was arrested as a truant and a photograph taken of him at Park Police headquarters. The photographs taken of defendant by police were used to obtain one victim's identification of defendant. The defendant was also identified by other victims at a court ordered lineup. Defendant was found guilty of one robbery count and acquitted on others. He was found guilty on the first robbery victim's identification of the photo. The victim was the person who had identified the defendant's photograph. Defendant claimed the victim's in court identification should have been suppressed as the fruit of the illegal arrest that resulted in the photographing and in court identification. 445 U.S. at 465–468, 100 S.Ct. 1244. The trial court found the arrest of defendant for truancy was without probable cause. The trial judge suppressed the photo identification evidence, and this issue was not addressed by the Supreme Court. The Court of Appeals had held the in court identification of defendant was the fruit of the prior illegal arrest. The Supreme Court reversed. The court said the "robbery victim's presence in the courtroom, at respondent's trial, was surely not the product of any police miscon-

duct." *Id.* p. 471, 100 S.Ct. 1244. "Nor did the illegal arrest infect the victim's ability to give accurate identification testimony", as is the case with Banks' testimony in this case. In *Crews,* the victim had a mental image formed from the time of the robbery. The trial court found the victim had an independent recollection of defendant from the photo identification. The court held defendant could not challenge his own presence at trial. The court said "respondent is not himself a suppressible fruit .." *Id.* p. 474, 100 S.Ct. 1244. *Crews* also indicated that as to other prior information identification in the FBI's possession, it might be used to identify defendant and that process would not be subject to suppression. *Id.* p. 476, 100 S.Ct. 1244.

The *Crews* case really does not answer the issue of suppression of the booking photograph in this case.[14] The court did not address the photograph's suppression because suppression had been conceded by the prosecution. That concession does not set the constitutional standard and the court's opinion does not say that it does. In this case, the arrest was not made to obtain the defendant's photograph for investigative purposes, which was the purpose in *Crews*. In this case, the photo was apparently only a routine booking photograph, which is a common procedure for records, administration, and correctional institutional control.[15] The photograph was not used in this case in connection with the offense of arrest, by the same sovereign for which the arrest was made, or in the same geographical jurisdiction.

With regard to an identification procedure after an illegal arrest, Professor LaFave, 5 *Search & Seizure* § 11.4(g), distinguishes situations where an illegal arrest occurred and the defendant has been subjected to a station house lineup and other circumstances of photographing or identification. In the case of station house lineup, LaFave asserts that the *Brown v. Illinois,* supra, three factor analysis should be used and that absent attenuation, the lineup identification may be the fruit of the poisonous tree. *Id.* pp. 311–313. As noted before, applying a *Brown* analysis in this case supports attenuation as to the post arrest identification showup. The "temporal proximity" circumstance in this case involves an identification made months later in a different jurisdiction. The "presence of intervening" circumstances in this instance is obvious. A different prosecution in a different jurisdiction by a different sovereign is involved. Also, defendant's own independent conduct, in part, led to the focus on him in this case. Finally, as noted before, the flagrancy of the "official misconduct" was minimal, being a misinterpretation of a Denver City ordinance. Under these circumstances, the identification of defendant by Banks is attenuated from defendant's illegal arrest. No privacy interest protected by the Fourth Amendment was involved. *New York v. Harris,* 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990); *Maryland v. Macon,* 472

---

**14.** In *United States v. Slater,* 692 F.2d 107 (10th Cir.1982) the court held in light of *Crews* and the identification by the crime victims, the introduction of a photo lineup from an illegal arrest was harmless. The case did not otherwise consider attenuation.

**15.** Research has not disclosed a Colorado statute on booking photographs or fingerprints. In *Mallory v. United States,* 354 U.S. 449, 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) the Supreme Court observed "The arrested person may of course be 'booked' by the police." Chief Justice Burger wrote in *Adams v. United States,* 399 F.2d 574, 579 (D.C.Cir.1968) (Burger J. concurring) "Necessary delay can reasonably relate to time to administratively process an accused with booking, fingerprinting and other steps ..." The practice of routine booking photographing "mug shots" has become a settled administrative fea-

ture of an arrest. "... [O]rderly law enforcement requires certain administrative procedures to take place after arrest and prior to arraignment. This process, which may include finger printing, photographing and getting a proper name and address from the defendant, is known as 'booking' ..." *United States v. Kehyaian,* 30 F.R.D. 544, 546–547 (S.D.N.Y.1962).

In *Curd v. City Court of Judsonia,* 141 F.3d 839, 841–842 (8th Cir.1998) the court observed:
 The custodial fingerprinting of Curd during the booking process was routine; a complaint regarding multiple prints (like a complaint regarding several allegedly unnecessary photographs) following a valid arrest is also simply too minor to rise to the level of a constitutional violation.
See *Tanner v. Heise,* 879 F.2d 572, 581 n. 7 (9th Cir.1989); Wayne R. LaFave, 3 *Search & Seizure,* (3d Ed.) § 5–1(e).

U.S. 463, 467, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985).

As to the booking photograph itself, La-Fave observes § 11.4(g) p. 320:

> Not all of the photo identification cases are of that kind, however, because photographs are typically taken as a matter of routine in the course of booking and because these photographs become a permanent part of police files, it sometimes happens that a photo routinely taken after an illegal arrest will on some future occasion be utilized to correct a person with some crime totally unrelated to the reasons why the pre-photographing illegal arrest was made. Under these circumstances, courts are inclined to find attenuation ...

This position seems to be the majority rule in state and federal cases in the United States. This conclusion defendant claims is foreclosed by the Supreme Court's decision in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), where in a rape case, a police dragnet indiscriminately rounded up 24 local blacks and fingerprinted them in an attempt to match the prints with one left by the assailant. There the prints were obtained for a specific investigative purpose. The primary illegality was employed to obtain fingerprint evidence in the immediate case. It did not involve a booking procedure and administrative retention of booking data. See LaFave, supra, p. 323 and *Paulson v. State*, 257 So.2d 303 (Fla.App.1972)(routine taking of prints after illegal arrest did not preclude their use on a later occasion). *Davis* does not apply to the situation in this case. The purpose of the primary illegality in *Davis* was to get the prints as evidence. No like situation exists in this case.

The government and Professor LaFave, supra p. 321, refer to the lead case of *People v. McInnis*, 6 Cal.3d 821, 100 Cal.Rptr. 618, 494 P.2d 690 (1972) where the California Supreme Court said:

> To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are 'fruits of the poisonous tree' would not merely permit the criminal 'to go free because the constable has blundered' (Cardozo, J., in *People v. Defore*

(1926) 242 N.Y. 13, 21, 150 N.E. 585, 587) but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested: if the photograph of a person obtained because of such an arrest becomes instrumental in the identification of that person for a crime committed many years later, it could be urged that But for the old illegal arrest the criminal would not have been identified. Rationally, however, a 'but for' relationship alone is insufficient to render the photograph inadmissible since it cannot be said that many years later the illegality of the earlier arrest was being 'exploited.'

100 Cal.Rptr. 618, 494 P.2d at p. 693.

A different approach was taken by the court in *United States v. Hollins*, 811 F.2d 384 (7th Cir.1987). The court held a photograph of defendant, taken while he was in custody on an allegedly pretextual arrest, was not subject to suppression because it could have been obtained through other means. However, the facts in *Hollins* do not correspond to those in this case and the application of an attenuation analysis is the better approach.

An approach like that in *McInnis* was followed in *United States ex rel. Moore v. Lane*, 612 F.2d 1046 (7th Cir.1980). The court said that even if the probable cause was not sufficient cause to stop the petitioner, that the victim's identification of the accused, initially based on a photograph obtained during the illegal arrest of defendant, did not have to be suppressed. The court concluded the exclusionary rule should not be applicable under the standards of *United States v. Ceccolini*, 435 U.S. 268, 280, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). However, the issue and facts are not the same as in this case. The facts in this case involve a significantly more remote situation and the concern now is not with identification per se, that has been determined to be proper, but with the suppression of the booking photograph.

Several states have found routine booking photographs not to be the fruit of an illegal arrest for the purposes of suppression. In *People v. Thierry*, 64 Cal.App.4th 176, 75 Cal.Rptr.2d 141 (1998) the court held that even if a police officer lacked probable cause to arrest defendant for a robbery which the officer was investigating, identification evidence obtained as a result, from which the victims of other robberies than the one for which defendant was arrested identified the defendant as the perpetrator of those other robberies, did not have to be suppressed. The court observed that the arrest was not made for the purpose of obtaining photographic evidence of the defendant. The court relied on *People v. McInnis*, supra, to support its conclusion. The court also said:

> Other jurisdictions have found an illegal arrest does not render an identification— or even a photograph taken during the illegal arrest—to be inadmissible. Generally these opinions adopt the *McInnis* analysis or a variation thereof. (See, e.g., *United States ex rel. Moore v. Lane* (7th Cir.1980) 612 F.2d 1046; *State v. Tyrrell* (1990) 234 Neb. 901, 453 N.W.2d 104; *People v. Pettis* (1973) 12 Ill.App.3d 123, 298 N.E.2d 372; *Kinsey v. State*, 639 S.W.2d 486; *State v. Price* (1976) 27 Ariz.App. 673, 558 P.2d 701.) *Robinson v. State* (1982) 53 Md.App. 297, 452 A.2d 1291 follows *McInnis* and cites numerous cases from other jurisdictions, but also adds to the analysis. "We think that the approach taken in these cases is the correct one, whether expressed as 'attenuation' or simply as a rational and commonsense application of the 'fruit of the poisonous tree' doctrine. In the absence of evidence (or a reasonably firm and detailed proffer of evidence) tending to show that appellant's...arrest was not only illegal but was merely a pretext for a general exploratory search (as in *Davis v. Mississippi*, (1969) 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676) or for gathering evidence in this case (as in *United States v. Crews*, (1980) 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537) routine 'booking' photograph taken as a consequence of that arrest would not be suppressible as tainted fruit in this proceeding." (*Robinson v. State*,

supra, 452 A.2d at p. 1299.) In stressing the motive for—not just the illegality of— the arrest which produced the defendant's photo, the Maryland appellate court appears to focus on the policies behind the exclusionary rule. The underlying purpose of that rule—to discourage government from violating citizens' rights to be free from unconstitutional searches and seizures—can be accomplished without barring identifications obtained through photos taken during illegal arrests. That is so even though it might be said the photos would not exist "but for" the arrest. Generally, law enforcement officers do not make arrests, legal or illegal, in order to obtain photographs they can use to seek identifications from the victims of crimes. They have other much more important motives for those arrests—to get suspects off the street, to search them for physical evidence, and to interrogate them. The taking of photographs and fingerprints are merely incidental events accompanying the arrest. And, indeed there is no need to arrest a suspect in order to take a photograph of him or her. Officers can surreptitiously photograph people on the street without arresting or detaining them in any way. So, it could be said the arrest is only incidental to the photograph just as the photograph is only an incident of the arrest. In that sense, the rationale for admitting photographs taken during illegal arrests partakes of the "inevitable discovery" as well as the "attenuation" limitations on the fruit of the poisonous tree doctrine. This is not to say every photograph taken while a defendant is held under an illegal arrest can be used in seeking identifications in other cases. Professor LaFave cautions "[e]ven if it is thought that the fears expressed by the *McInnis* dissenters are overstated, and that consequently it is not necessary to bar all use of photographs taken incident to illegal arrests, courts should nonetheless be vigilant in determining in particular cases whether the photograph was come by as a consequence of an arrest made for the purpose of adding defendant's picture to the police mug books." (3 LaFave, Search and Seizure (1996)

§ 11.4(g), p. 322, italics added.) LaFave's admonition makes sense. If the courts were to sanction the practice of making illegal arrests for the specific purpose of collecting photographs to be used in future or ongoing investigations we would encourage an increase, perhaps dramatic, in the frequency of unconstitutional conduct on the part of law enforcement. In those instances, the taking of the photographs supplies an important motive, perhaps the prime motive, for the illegal arrests. Accordingly, to protect constitutional rights, the underlying purpose of the exclusionary rule would dictate the courts bar the photographs and resulting identifications.

75 Cal.Rptr.2d at pp. 144–145.

This case and the cited cases support the position that the booking photograph in this case is not subject to suppression. The government, in its supplemental memorandum (File Entry # 100, p. 6), relies on the *McInnis* case and others cited.

It is concluded this position is well reasoned. Recently, in *Commonwealth v. Manning,* 44 Mass.App.Ct. 695, 693 N.E.2d 704 (1998) the court addressed the issue of suppression of a defendant's booking photograph. The court said the fact that defendant's arrest for an unrelated crime was later declared unlawful did not require suppression of his booking photograph or the victim's subsequent identification from the photograph. The court applied the three factor analysis in *Brown.* The court concluded:

> Here, the purpose of the defendant's arrest was not to obtain evidence in regard to the Brown shooting. The officers were unaware of the Brown incident at the time they made the arrest. After the defendant's arrest, the officer investigating the Brown shooting learned that a man fitting the shooter's description had been arrested for unlawfully carrying a nine millimeter handgun, the type of weapon the officer believed was used in the Brown shooting. That officer, who knew nothing of the circumstances of the illegal arrest, then created the photographic array containing the defendant's booking photograph. The actions of the police in making the illegal arrest did not amount to flagrant misconduct. The police were responding to a tip that the defendant had fired gunshots and was in possession of a firearm. "When a tip ... concerns the possession of a firearm, it deserves the immediate attention of law enforcement officials." *Commonwealth v. Stoute,* 422 Mass. 782, 790, 665 N.E.2d 93 (1996). The fact that months later a judge ruled that the arrest was illegal because the police did not have probable cause does not demonstrate that the police displayed flagrant misconduct under the circumstances present at the time of that arrest. Finally, the taking of the defendant's photograph during the booking process was standard police procedure (see G.L. c. 263, § 1A), and bore no relation to the purpose or validity of the arrest. See *People v. McInnis,* 6 Cal.3d 821, 825–826, 100 Cal.Rptr. 618, 494 P.2d 690, cert. denied, 409 U.S. 1061, 93 S.Ct. 562, 34 L.Ed.2d 513 (1972)(booking photograph from unrelated arrest not suppressed, because no evidence of exploitation or other improper conduct, and no link other than coincidence between that arrest and offense being tried). In sum, we hold that the judge did not commit error when he denied the defendant's motion to suppress the booking photograph and the subsequent identification of the defendant's photograph as the person who shot Brown.

693 N.E.2d pp. 708–709.

Applying *Manning* to the facts of this case, the booking photograph may be used in the trial of this case.

It must be kept in mind the exclusionary rule is not a constitutional requirement but a remedy for a redress of a unconstitutional conduct. *Pennsylvania Board of Probation and Parole v. Scott,* —— U.S. ——, ——, 118 S.Ct. 2014, 2016, 141 L.Ed.2d 344 (1998); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). It applies only where "its deterrence benefits outweigh the substantial social costs inherent in precluding consideration of reliable, probative evidence." *Scott,* supra, at p. ——, 118 S.Ct. at 2016. In

addition, as the court in *Nardone* stated "good sense" is a significant factor in calculating attenuation. Applying these interests, the court concludes exclusion of defendant's booking photograph should be denied.

### The Statements and Testimony of Dale Robbins

■ Defendant, for the first time in his memoranda, seeks exclusion of the statements and testimony of Dale Robbins, the person in whose vehicle defendant was a passenger at the time of the police stop.

The request is untimely as not being raised in his motion to suppress. DUCrimR 12–1(d). It may not be raised in post hearing memorandum. Further, defendant has not developed a record on this issue.

■ However, assuming the issue is properly before the court, the suppression of the testimony of Dale Robbins is not constitutionally required. Robbins' identity was determined independently from the illegal arrest of defendant. Robbins was the driver of the Nissen vehicle stopped by police in Denver. The stop of the vehicle by the Denver officers was lawful. The identity of Robbins and his connection with Beckwith was determined by lawful means at that time. The officers observed the Clorox bottle and the red dye. Robbins resembled the bank robber in the bank surveillance photo of the Hampton (Denver) robbery. Therefore, Robbins was found and identified independent of the illegal arrest of defendant and his statements and evidence are not tainted by defendant's arrest. *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *United States v. Lin Lyn Trading,* 149 F.3d 1112 (10th Cir.1998)(evidence is admissible if from a source wholly independent of the illegal conduct); *United States v. Eylicio–Montoya,* 70 F.3d 1158, 1165 (10th Cir.1995)(same). The illegal arrest of Beckwith is unrelated to the stop, discovery and identification of Robbins. There is no initial showing that Robbins' identity was at least a "but for" circumstance of the illegality employed against Beckwith. *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)(initially the exclusionary rule has possible application only if there is some "but for" relationship between the illegality towards the defendant and the evidence acquired); *Hamilton v. Nix,* 809 F.2d 463, 466 (8th Cir.1987).

In *United States v. Griffin,* 48 F.3d 1147 (10th Cir.1995) the court held that the independent source rule applied to information obtained from a coconspirator before defendant's arrest and the testimonial evidence was admissible. In this case, the discovery of Dale Robbins was independent of any illegality. See also *United States v. Weller,* 652 F.2d 964 (10th Cir.1981); *United States v. Stevens,* 612 F.2d 1226 (10th Cir.1979). The record supports that conclusion and defendant has shown nothing to the contrary.

■ In addition, in *United States v. Ceccolini,* supra, the Supreme Court considered the question of whether a witness's testimony, uncovered as a result of an illegal search, was admissible as sufficiently attenuated from a primary illegality. The attenuation doctrine can apply to Robbins' testimony and evidence if there were a basis to conclude that it was the product of illegal activity against defendant. In *Ceccolini* the Supreme Court did not hold that the fruit of the poisonous tree doctrine did not apply to witnesses per se. However, the court stated criteria to be applied for consideration as to whether attenuation may exist in such a case.

*Ceccolini* involved an illegal seizure of an envelope that belonged to defendant and an effort to suppress the testimony of a person who said the envelope was defendant's. The court said:

.... that the degree of free will exercised by the witness is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application. This is certainly true when the challenged statements are made by a putative defendant after arrest, *Wong Sun,* supra, 371 U.S. at 491, 83 S.Ct. at 419; *Brown v. Illinois,* supra, and a fortiori is true of testimony given by non-defendants. The greater the willingness of the witness to freely testify ...

\* \* \* \* \* \*

Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses—even putative defendants—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, "serious obstructions to the ascertainment of truth"; accordingly, "[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions."

435 U.S. at p. 277, 98 S.Ct. 1054.

The court referred to its holding in *Michigan v. Tucker* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) where a live witness' testimony of a person identified by defendant was not allowed in spite of a defective *Miranda* warning. The court in *Ceccolini* found attenuation to be appropriate.

Applying these standards to this case there is no showing of any reluctance or unwillingness of Robbins to testify. The illegality directed to Beckwith does not have a nexus to Robbins and the connection is insignificant. Even if Robbins has been provided some form of plea bargain assistance, of which there is no evidence, that fact would not preclude a finding of attenuation. *United States v. McKinnon*, 92 F.3d 244 (4th Cir.1996). The facts of the case support a conclusion that there is no basis to grant defendant's request to suppress the statements or testimony of Dale Robbins. See *United States v. Brookins*, 614 F.2d 1037 (5th Cir.1980); *United States v. Miller*, 666 F.2d 991 (5th Cir.1982); *United States v. Hooton*, 662 F.2d 628 (9th Cir.1989).

### Conclusion

The defendant's motion to suppress should be **Granted as to all evidence obtained resulting from his arrest on August 30, 1996,** including his wallet, license, red dye bills and other money and narcotics. State-

ments defendant made **on August 30, 1996 should be suppressed.** The **statement** defendant **made on September 5, 1996** to FBI Agent Castro **should be suppressed.** The **statements** defendant made **on September 11, 1996 may be used** and defendant's **motion to suppress these statements should be denied.** Defendant's motion to **suppress his booking photograph** or any **identification** from it and the **statements** and **testimony** of Dale Robbins **should be denied.**

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the Report and Recommendation within ten (10) days after receiving it. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.